## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MASSACHUSETTS
## EASTERN DIVISION

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| Massachusetts Elephant & Castle | : | |
| Group, Inc., et al.[1] | : | Case No. 11-16155 |
| | : | |
| Debtors | : | Jointly Administered |

### DECLARATION OF KEITH RADFORD
### IN SUPPORT OF FIRST DAY MOTIONS

I, Keith Radford, being fully sworn, hereby declare that the following is true to the best of my knowledge, information and belief:

1.     I am the Chief Financial Officer of each of the above-captioned debtors and debtors in possession (collectively, the "Debtors"). I have been the Chief Financial Officer of the Debtors since December, 2008. I am familiar with the Debtors' day-to-day operations, financial condition, books and records, and business affairs.

2.     On June 28, 2011 (the "Petition Date"), the Debtors commenced these cases (the "Chapter 11 Cases") by each filing a voluntary petition for relief under chapter 11 of title 11 of the United States Code. Sections 101-1532 (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Massachusetts (the "Court").

3.     To minimize any adverse effects on their business as a result of the commencement of these Chapter 11 Cases, the Debtors intend to request various types of relief in certain "first day" applications and motions (collectively, the "First Day Motions"). The First

---

[1] The debtors in these cases, along with the last four digits of the federal tax identification number for each of the debtors, are Massachusetts Elephant & Castle Group, Inc. (5090), Elephant and Castle of Pennsylvania, Inc. (9152), E&C Pub, Inc. (4001), Elephant & Castle Inc. (Washington) (3988), Elephant & Castle (Chicago) Corporation (5254), Elephant & Castle East Huron, LLC (8642), E&C Capital, LLC (4895), Elephant & Castle Illinois Corporation (2811), E&C Eye Street, LLC (1803), Elephant & Castle International, Inc. (5294), Elephant & Castle Pratt Street, LLC (7898), Elephant & Castle Group Inc. (no U.S. EIN), Elephant & Castle Canada Inc. (no U.S. EIN), Repechage Investments Limited (no U.S. EIN), Elephant & Castle, Inc. (Texas) (no U.S. EIN). The debtors' corporate offices are located at 50 Congress Street, Suite 900, Boston, MA 02109.

Day Motions seek relief, among other things, to: (a) continue the Debtors' operations while in chapter 11 with as little disruption as possible; (b) maintain the confidence and support of key constituencies; and (c) establish procedures for the smooth and efficient administration of these Chapter 11 Cases.  Gaining and maintaining the support of the Debtors' employees and other key constituencies, as well as maintaining the day-today operations of the Debtors' business with minimal disruption, will be crucial to the success of the Debtors' efforts in these Chapter 11 Cases.

4.      I submit this Declaration in support of the First Day Motions.  Except as otherwise indicated, all statements in this Declaration are based on my personal knowledge, my review of relevant documents or my opinion based upon my experience and knowledge of the Debtors' operations and financial condition.  If I were called upon to testify, I could and would testify to each of the facts set forth herein based on such personal knowledge, review of documents or opinion.  I am authorized to submit this Declaration on behalf of the Debtors.

## I.

## GENERAL BACKGROUND

A.    **The Chapter 11 Cases and Ancillary Proceeding**

5.      As discussed above, on June 28, 2011, the Chapter 11 Cases were commenced by the filing of petitions in bankruptcy.  Following the filing of the Chapter 11 Cases, Debtor Massachusetts Elephant & Castle Group, Inc. ("Mass E&C"), intends to commence an ancillary proceeding (the "Ancillary Proceeding") under Part IV of the Companies' Creditors Arrangement Act (the "CCAA") in the Ontario Superior Court of Justice (Commercial List) (the "Ontario Court").  Mass E&C, as the proposed foreign representative for the Debtors in the Canadian Proceeding, intends to seek recognition of the Chapter 11 Cases and certain orders

entered in the Chapter 11 Cases.  BDO Canada Limited is the proposed court-appointed

Information Officer in the Canadian Proceeding.

6.      The Debtors continue to operate their business and manage their properties as

debtors-in-possession, pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No

trustee, examiner or statutory committee has been appointed in the Chapter 11 Cases.

**B.      Overview of the Debtors' Business**

7.      Debtor, Elephant and Castle Group, Inc. ("E&C" or the "Company") operates and

franchises authentic, full service British style restaurant pubs in the United States and Canada.

Specifically, the Company, through its affiliate Debtors, has established ten company-owned

locations and one franchised location in the United States, in addition to nine company-owned

locations (including one location branded as "The Exchange Pub and Restaurant" and one

location branded as "Rosie's on Robson") and one franchised location in Canada.[2]  The Debtors'

headquarters and corporate offices are located in Boston, Massachusetts.

8.      Each restaurant employs approximately 45 people, approximately 30% of whom

work full-time.  For fiscal year end 2010, the Debtors had an average restaurant volume in the

United States of $2.9 million and in Canada of $2.3 million.  As of June 2011, the Debtor's

employed a total of 866 people (492 in the United States and 374 in Canada).

9.      The Debtors compete in the full-service restaurant category, which is comprised

of several segments, including lower-end casual, casual dining and fine dining.  The Debtors are

unique in that they are the only "pub-themed" restaurant within the casual dining sector.  While

there are many competitors which are considered microbrew or mid-level casual dining concepts,

these competitors do not possess the Debtor restaurants' distinctive authentic décor or

---

[2] One Debtor (Elephant & Castle (Chicago) Corporation), has a subsidiary that has a joint venture interest in an entity that operates the Elephant & Castle Restaurant in San Francisco.  Neither that subsidiary nor the joint venture are debtors."

food/beverage offering. Most of the Debtors' restaurants are located in heavily populated downtown locations (i.e., Boston, Chicago and Toronto), nearby hotels, office buildings, residential apartments, and retail establishments. The Company prides itself in providing quick food and beverage services to its "on-the-go" customers.

## C.    The Debtors' Corporate Structure

10.    The Debtor, E&C was first established in 1977. E&C is the holding company for the affiliate debtors. E&C became a publicly traded company on the OTCBB exchange under the symbol "PUBSF" in 1993. In 1995, E&C established its first location in the United States (Philadelphia, PA). In 2007, the Debtor Repechage Investments Limited ("Repechage," owned by David Dobbin and members of his family) acquired E&C. A corporate organization chart reflecting the Debtors' corporate structure is attached hereto as Exhibit "A".

11.    In the United States, each restaurant's General Manager reports to the E&C U.S. Brand Leader. In addition, three General Managers ("Senior GMs") have additional regional oversight responsibilities. In Canada, each restaurant's General Manager reports to the Canadian District Operator ("DO") who in turn reports to the E&C Canada Brand Leader. The Brand Leaders, DO and Senior GMs supervise and assist their respective General Managers, with the goal of achieving targeted sales and profitability through the implementation and operation of E&C's strategic initiatives. Regular meetings are held between the General Managers, DO, and Brand Leaders to discuss financial results and operational improvement opportunities. Regular meetings are also held between the Brand Leaders and E&C's senior management to discuss financial results and strategic initiatives.

## D.    The Debtors' Capital and Debt Structure

12.     As of the Petition Date, Debtor E&C was a borrower and the other Debtors,

guarantors under certain Loan Agreement dated as of April 20, 2007 (the "original Credit

Agreement") (as amended, restated or otherwise modified from time to time (the "Loan

Agreement") with GE Canada Equipment Financing. G.P. ("GE Canada"). The Original Loan

Agreement provided E&C with a non-revolving credit facility in the amount of U.S.

$14,000,000.00 and amended by the First Amendment to Loan Agreement dated March 18, 2008

to, among other things, provide for an additional tranche of such non-revolving credit facility in

a principal amount not exceeding C $1,250,000.00. The Original Loan Agreement was

superseded and replaced by a First Amended and Restated Loan Agreement dated as of

November 21, 2008, a Second Amended and Restated Loan Agreement dated as of December

29, 2008, a Third Amended and Restated Loan Agreement dated as of October 16, 2009 and a

Fourth Amended and Restated Loan Agreement dated as of December 18, 2009. E&C's

obligations under the Loan Agreement are secured by substantially all of its assets, with each of

the other Debtors guarantying E&C's obligations thereunder.

13.     In addition, Fifth Street Finance Corp. (as Successor-in-Interest to Fifth Street

Mezzanine Partners III, L.P. ("Fifth Street")) provided certain facilities to the Debtor Elephant &

Castle, Inc. pursuant to a credit agreement dated April 20, 2007, as amended (the "Original Fifth

Street Credit Agreement"). The Debtors, GE Canada and Fifth Street are parties to an

interlender agreement, as amended and restated (the "Interlender Agreement"). The outstanding

principal under the Original Fifth Street Credit Agreement was partially repaid, and the

remaining outstanding amounts were assigned to Repechage, pursuant to a credit agreement

dated October 16, 2009.

{M0942774.1}

14.    For the reasons discussed in the Declaration of David Dobbin in Support of the

First Day Motions (the "Dobbin Declaration")[3] the Debtor E&C was unable to continue to make

debt service payments to GE Canada and is in default under its loan.  In addition, Repechage is

in default under its loan with Fifth Street.  On April 18, 2011, the Debtors entered into a

Forbearance Agreement with GE.  In addition, Fifth Street provided notice to GE Canada that it

was commencing the Standstill Period (as that term is defined in the Interlender Agreement).[4]

## II.

## FIRST DAY MOTIONS

15.    Concurrently with the filing of these Chapter 11 Cases, the Debtors will be filing

a number of First Day Motions.  The Debtors anticipate that the Court will conduct a hearing

soon after the commencement of the Debtors' Chapter 11 Cases (the "First Day Hearing"), at

which the Court will hear the First Day Motions.

16.    Generally, the First Day Motions have been designed to meet the goals of:  (a)

continuing the Debtors' operations in chapter 11 with as little disruption and loss of productivity

as possible; (b) maintaining the confidence and support of customers, employees and certain

other key constituencies; and (c) establishing procedures for the smooth and efficient

administration of these cases.  I have reviewed each of the First Day Motions, including the

exhibits thereto and I believe that the relief sought in each of the First Day Motions is tailored to

meet the goals described above and, ultimately, will be critical to the Debtors' ability to

maximize the value of their assets for the benefit of all of the Debtors' economic stakeholders.  A

description of each of the First Day Motions is provided below.

---

[3] The Dobbin Declaration is being filed contemporaneously with this Declaration and First Day Motions and
contains additional background regarding the events leading to the filing of the Chapter 11 Cases.
[4] Other lenders who are, or may be, asserting secured claims against at least some of the Debtors also include Sysco
San Diego, Inc. ("Sysco"), Royal Bank of Canada ("Royal Bank") and Toronto Dominion Bank ("TD Bank").

**A.     Motion for Order Authorizing Joint Administration of Chapter 11 Cases Pursuant
to Federal Rule of Bankruptcy Procedure 1015 and MLBR 1015-1**

17.     The Debtors have requested entry of an order directing the joint administration of

the Debtors' chapter 11 cases and the consolidation thereof for procedural purposes only.  Many

of the motions, applications, hearings, and orders that will arise in these chapter 11 cases will

affect all Debtors.  For that reason, the Debtors respectfully submit that their interests, as well as

the interests of their creditors and other parties in interest, would be best served by the joint

administration of these chapter 11 cases, for procedural purposes only.

18.     The Debtors submit that the joint administration of their cases should be

maintained under the case name and number assigned to Mass E & C, a Debtor entity

incorporated in the state of Massachusetts that also operates a restaurant in downtown Boston,

and request that the Clerk of the Court maintain one file and one docket for each of the Debtors'

chapter 11 cases under the case name and number.  In addition, the Debtors seek the Court's

direction that a separate docket entry be made on the chapter 11 case dockets  of the other

Debtors substantially as follows:

> An order has been entered in this case directing the procedural
> consolidation and joint administration of the chapter 11 cases of
> Massachusetts Elephant & Castle Group, Inc., Repechage
> Investments Limited, E & C Capital, LLC,     E & C Pub, Inc., E
> & C Eye Street, LLC, Elephant & Castle (Chicago) Corporation,
> Elephant & Castle East Huron, LLC, Elephant & Castle Illinois
> Corporation, Elephant & Castle International, Inc., Elephant &
> Castle of Pennsylvania, Inc., Elephant & Castle Pratt Street, LLC,
> Elephant & Castle Group Inc., Elephant & Castle, Inc. (Texas),
> Elephant & Castle Inc. (Washington), and Elephant & Castle
> Canada Inc., which have concurrently commenced chapter 11
> cases.  The docket in the chapter 11 case of Massachusetts
> Elephant & Castle Group, Inc., Case No. 11-
> _____(_____), should be consulted for all
> matters affecting this case.

19.     The Debtors further request that the caption of these chapter 11 cases be modified

as follows to reflect their joint administration under the lead chapter 11 case of Mass E & C:

**IN THE UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
EASTERN DIVISION**

| | | |
|---|---|---|
| | : | Chapter 11 |
| In re: | : | |
| | : | Case No. 11-_____ ( ) |
| MASSACHUSETTS ELEPHANT & | : | |
| CASTLE GROUP, INC., | : | Jointly Administered |
| | : | |
| Debtors. | : | |
| | : | |

20.     Finally, the Debtors seek authority to file the Debtors' monthly operating reports

on a consolidated basis if the Debtors determine, after consultation with the United States

Trustee, that consolidated reports would further administrative economy and efficiency without

prejudice to any party in interest and that the reports would accurately reflect the Debtors'

consolidated business operations and financial affairs.

**B.      Debtor's Motion Pursuant to Section 1505 of the Bankruptcy Code for
Authorization of Massachusetts Elephant & Castle Group, Inc. to Act as
the Foreign Representative of the Debtors**

21.     The Debtors seek an order, substantially in the form attached hereto as Exhibit A,

authorizing Massachusetts Elephant & Castle Group, Inc. ("Mass E&C") to take the following

actions:  (i) act as the foreign representative of the Debtors; (ii) seek recognition by the Ontario

superior Court of Justice (Commercial List) (the "Ontario Court") of the Chapter 11 Cases (as

herein defined) and of certain orders of the Court made from time to time in the Chapter 11

Cases; (iii) request that the Ontario Court lend assistance to this Court; and (iv) seek any other

appropriate relief from the Ontario Court that the Debtors deem just and proper.

22.     Section 1505 of the Bankruptcy Code allows a debtor in possession to obtain a
court order recognizing the debtor in possession as the foreign representative of the debtor's
estate, in order to submit a petition to a foreign court requesting recognition of the debtor's
chapter 11 case.  Specifically, section 1505 of the Bankruptcy Code provides:

> A trustee or another entity (including an examiner) may be
> authorized by the court to act in a foreign country on behalf of an
> estate created under section 541.  An entity authorized to act under
> this section may act in any way permitted by the applicable foreign
> law.

11 U.S.C. Section 1505.  Section 1505 only applies to cases filed under chapters other than
chapter 15 of the Bankruptcy Code because a chapter 15 case does not create an estate under
section 541.  For chapter 11 cases, authority to act as a foreign representative may be granted to
the debtor in possession because a "trustee," as defined by section 1502(6) of the Bankruptcy
Code, "includes...a debtor in possession in a case under any chapter of this title."  Id. Section
1502(6).

23.     An elicit grant of authority to act as the foreign representative is meant to
facilitate the process of petitioning for recognition in a foreign court.  Clear evidence of a chapter
11 debtor's authority to act in a foreign country is particularly necessary because a chapter 11
case commences immediately upon the filing of a petition, with no order signed by the court that
explicitly appoints the debtor as the fiduciary or trustee of the debtor's estate.  The fact that a
chapter 11 debtor has this authority by virtue of being a debtor in possession may not be
persuasive to a foreign court.

24.     Moreover, absent a court order, a chapter 11 debtor may find it difficult to satisfy
the requirements of a petition for recognition.  These requirements are substantially similar in
most countries that have adopted the Model law, including Canada.

{M0942774.1}

25.     The relief sought by this Motion is, therefore, the first in a two step process. If granted, Mass E&C expects in due course to submit an application to the Canadian Court that seeks recognition of the Chapter 11 Cases as foreign main proceedings.

26.     If the Ontario Court decides to recognize the Chapter 11 Cases as foreign main proceedings, the Debtors will benefit from the protection of an automatic stay against commencement or continuation of actions or proceedings concerning the Debtors' assets, rights, obligations, and liabilities in Canada. Even if the Ontario Court holds that the Chapter 11 Cases are not foreign main proceedings, the Ontario Court has discretion to order a stay. In addition, the foreign representative can seek a wide range of relief from the Ontario Court where it is necessary to protect the assets of the Debtors or the interests of its creditors in Canada.

**C.      Retention of Professionals**

**Application of the Debtors Pursuant to Sections 327(a) and 329 of the Bankruptcy Code for an order Authorizing Employment and Retention of Eckert Seamans Cherin & Mellott, LLC as Attorneys for the Debtors Nunc Pro Tunc to the Petition Date**

27.     The Debtors seek to employ and retain Eckert Seamans as their principal bankruptcy counsel to represent them as debtors-in-possession in these bankruptcy cases effective as of the Petition Date. Accordingly, the Debtors respectfully request the entry of an order authorizing them to employ and retain Eckert Seamans as their attorneys under a general retainer to perform the legal services that will be necessary during these chapter 11 cases.

28.     The Debtors have selected Eckert Seamans because this case is likely to be complex and will require counsel to the Debtors with extensive experience in restructuring and reorganizing insolvent companies. Eckert Seamans has extensive experience and knowledge in the field of reorganization, restructuring, debtors' and creditors' rights and business reorganizations under chapter 11 of the Bankruptcy Code. In addition, Eckert Seamans is very

familiar with the Debtors' businesses and affairs and many of the potential legal issues which may arise in the context of these chapter 11 cases. Accordingly, the Debtors believe that Eckert Seamans is both well-qualified and able to assist it in these chapter 11 cases.

29.   The Debtors have selected Eckert Seamans for the reason that they believe Eckert Seamans is needed for the Debtors to properly perform their duties and functions; Eckert Seamans has extensive experience in matters of this character; and the Debtors believe that Eckert Seamans is well-qualified and uniquely able to represent them in these proceedings in an efficient and timely manner.

30.   The professional services which Eckert Seamans shall render include, but are not limited to, the following:

(a)   to provide to the Debtors legal services with respect to its powers and duties as a debtors-in-possession in continuing the management and operation of their businesses and properties;

(b)   to appear before this Court, any appellate courts and United States Trustee and protect the interests of the Debtors' estates before such courts and the United States Trustee;

(c)   to prepare on behalf of the Debtors necessary applications, motions, complaints, answers, responses, orders, reports, and other legal papers;

(d)   to represent the Debtors in any matters involving contests with secured and unsecured creditors;

(e)   to attend meetings and negotiate with representatives of creditors or other parties in interest as required of the Debtors;

(f)   to negotiate and prepare on behalf of the Debtors a bankruptcy plan, disclosure statement and pursue confirmation and approval thereof;

(g)    to advise the Debtors in connection with any contemplated sales of certain assets;

(h)    to take such actions to protect and preserve the Debtors' estates as necessary and as they arise; and

(i)    to perform all other legal services for the Debtors which may be necessary herein.

**Application of the Debtors for an Order Authorizing the Retention and Employment of Heenan Blaikie LLP as Canadian Counsel to the Debtors Nunc Pro Tunc to the Commencement Date Pursuant to Sections 327(e) and 328(a) of the Bankruptcy Code**

31.    The Debtors seek to employ Heenan Blaikie as their Canadian counsel to assist the Debtors in connection with carrying out its duties and responsibilities under the Bankruptcy Code during the Chapter 11 Cases by advising the Debtors on relevant aspects of Canadian law and taking all actions necessary to protect the Debtor's interests in connection with an application for an ancillary proceeding under the Companies' Creditors Arrangement Act (the "CCAA"). The Debtors seek to do so pursuant to sections 327(e) and 328(a) of the Bankruptcy Code and the terms of this Application.

32.    The Debtors have selected Heenan Blaikie as their Canadian counsel during the pendency of its bankruptcy case because of the firm's extensive experience and knowledge in the field of debtors' and creditors' rights, business reorganizations and liquidations under the CCAA and the Bankruptcy and Insolvency Act (the "BIA") and its general expertise, experience, and knowledge of Canadian law. In selecting counsel to advise the Debtors with respect to seeking recognition of the Chapter 11 Cases under and pursuant to Part IV of the CCAA, the Debtors sought Canadian counsel with experience in representing debtors in cross-border reorganization cases and other debt restructurings. Heenan Blaikie has such experience as Heenan Blaikie is

regularly involved in bankruptcy and insolvency cases with both American and Canadian

components. The Debtors believe that Heenan Blaikie is both well qualified and able to represent

it in these Chapter 11 Cases and any related Canadian proceedings in a most efficient and timely

manner.

33.     The Debtors believe that the services of Heenan Blaikie are necessary for the

effective administrative of its bankruptcy case. Subject to further order of this Court, Heenan

Blaikie will render the following professional services:

> (a)     provide legal services in connection with proceedings under the
> Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, as amended (the
> "CCAA"), before the Ontario Superior Court of Justice (Commercial List) (the "CCAA
> Proceeding"), including seeking recognition of the Chapter 11 Cases under the CCAA;
> and

> (b)     provide legal services which are reasonably necessary and appropriate to
> advise and assist the Debtors with matters of Canadian law affecting the Debtors,
> including, without limitation, in connection with the Chapter 11 Cases and the CCAA
> Proceeding.

**Application for Order Approving the Debtors' Agreement With Epiq
Bankruptcy Solutions, LLC and Appointing Epiq Bankruptcy Solutions,
LC as Claims, Noticing and Balloting Agent for the Debtors**

34.     The Debtor has requested that this Court enter an Order authorizing and

approving the retention and appointment of Epiq Bankruptcy Solutions, LLC, as claims agent to,

among other things:  (a) serve as the Court's notice agent to mail notices to the estate's creditors

and parties-in-interest; (b) provide computerized claims, claims objection, and balloting database

services; and (c) provide expertise and consultation and assistance in claim and ballot processing

and other relevant administrative services.

35.     The Debtors believe that the Notice Agent is particularly well-suited to act as the

claims, noticing and balloting agent in these cases because the Notice Agent is a claims

management and case administration firm with more than 19 years of in-depth experience in

performing noticing, claims processing, claims reconciliation, solicitation, tabulation and other administrative tasks for chapter 11 debtors. The Notice Agent also is experienced in performing plan voting and distribution services, and other services relating to its role as a claims and noticing agent.

36.     Given that large number of creditors involved in the Debtor's case, the Debtor and the Clerk of the Court will need the assistance of an experienced claims agent to effectuate appropriate and accurate notice and filing of various pleadings. Based upon Epiq's experience in other large chapter 11 cases, the Debtor concluded that Epiq was the best choice for claims agent in this case.

37.     It is anticipated that the Notice Agent will perform, among other things, the following services as claims, noticing and balloting agent at the request of the Debtors or the office of the Clerk of the Court (the "Clerk's Office"):

(a)     assist the Debtors with preparation and distribution of all required notices in these Chapter 11 Cases including, among others:

(i)     a notice of the commencement of these Chapter 11 Cases and any initial meeting of creditors under section 341(a) of the Bankruptcy Code;

(ii)    notice of claims bar dates;

(iii)   notice of objections to claims;

(iv)    notices of any hearings on the Debtors' disclosure statement and confirmation of the Debtors' chapter 11 plan; and

(v)      such other miscellaneous notices as the Debtors or the Court may

deem necessary or appropriate for the orderly administration of

these Chapter 11 Cases;

(b)      promptly after the service of a particular notice, file with the Clerk's

Office a certificate or affidavit of service that includes: (i) a copy of the

notice served; (ii) a list of persons upon whom the notice was served,

along with their addresses; and (iii) the date and manner of service;

(c)      receive, examine and maintain copies of all proofs of claim and proofs of

interest filed in these Chapter 11 Cases;

(d)      maintain official registers in the Debtors' Chapter 11 Cases by docketing

all proofs of claim and proofs of interest in the applicable claims database

that includes the following information for each such claim or interest

asserted:

(A)     the name and address of the claimant or interest holder and any

agent thereof, if the proof of claim or proof of interest was filed by

an agent;

(B)     the date the proof of claim or proof of interest was received by the

Notice Agent and/or the Court;

(C)     the claim number assigned to the proof of claim or proof of

interest; and

(D)     the asserted amount and classification of the claim,

(e)      implement necessary security measures to ensure the completeness and

integrity of the claims registers;

(f)  transmit to the Clerk's Office a copy of the claims registers, upon request;

(g)  maintain an up-to-date mailing list for all entities that have filed proofs of claim or proofs of interest and make the list available upon request to the Clerk's Office or any party in interest;

(h)  provide access to the public for examination of copies of the proofs of claim or proofs of interest filed in these Chapter 11 Cases without charge during regular business hours;

(i)  record all transfers of claims pursuant to Bankruptcy Rule 3001(e) and provide notice of the transfers as required by Bankruptcy Rule 3001(e);

(j)  promptly comply with such further conditions and requirements as the Clerk's Office or the Court may at any time prescribe;

(k)  provide such other claims processing, noticing, solicitation, balloting, tabulation, disbursing and related administrative services as may be requested from time to time by the Debtors, including, but not limited to, assisting in preparation of the Debtors' schedules of assets and liabilities and statements of financial affairs, if necessary;

(l)  distribute the applicable solicitation materials to each holder of a claim against or interest in the Debtors;

(m)  if necessary, to respond to mechanical and technical claims, noticing, distribution, solicitation and other administrative inquiries;

(n)  if necessary, to receive, review and tabulate the ballots cast, and make determinations with respect to each ballot as to its timeliness, compliance

with the Bankruptcy Code, Bankruptcy Rules and procedures ordered by this Court; and

(o)    in addition to the foregoing, the Debtors seek to employ the Notice Agent to assist it with, among other things, certain data processing and ministerial administrative functions, including, but not limited to, acting as disbursing agent in connection with the chapter 11 plan process.

**D.    Motion of the Debtors for an Order Pursuant to Sections 105, 361, 362, and 363 of the Bankruptcy Code (a) Authorizing Use of Cash Collateral; (b) Granting Adequate Protection; (c) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001; and (d) Granting Related Relief**

38.    By the Motion, the Debtors request, pursuant to sections 105, 361, 362, and 363 of chapter 11 of title 11 of the United States Code (the Bankruptcy Code ), Rules 2002, 4001, and 9014 of the Federal Rules of Bankruptcy Procedure (the Bankruptcy Rules ), and Massachusetts Local Bankruptcy Rule ( MLBR ) 4001-2 (a) the authority to use cash collateral and grant adequate protection to the Lenders in the form of replacement liens and the other protections described below and (b) the scheduling of a final hearing (the Final Hearing ) thereon. A proposed Interim Order is attached hereto as Exhibit A.

39.    One of the Debtor's pressing concerns is the need for the immediate use of Cash Collateral pending a final hearing on the Motion. The Debtor requires the use of Cash Collateral in order to meet its expenses and maintain the operation of its business. Without the use of Cash Collateral, the Debtor's operations will be substantially and irreparably harmed. The continued operation of the Debtor's business is essential to its operation during this case. In order to avoid immediate and irreparable harm to the Debtor's estate, the Debtor requires the use of Cash Collateral to pay, among other things, payroll, utilities, taxes, insurance, critical vendors and other ordinary business costs and expenses.

40.     The Debtor's ordinary course operations generate Cash Collateral through the sale of food and related items. The Lenders (as the term is described in the Motion) asserts, or may assert, a security interest in some or all of the Debtors' Cash Collateral. As adequate protection for any interest in Cash Collateral which Lenders may have, the Debtors are willing to grant Lenders replacement liens in the Debtors' post-petition Cash Collateral, to the same extent, priority and validity as its pre-petition liens, if any, and only to the extent that the Debtors diminish such Cash Collateral. The proposed replacement liens should provide sufficient adequate protection to prevent any diminution in value to the collateral.

41.     The Debtors seek to use Cash Collateral in accordance with its proposed budget (with allowance for a 10% overage on each expense item not to exceed 10% in the aggregate), which was attached to the Motion, for an initial four (4) week period and thereafter upon further order of this Court, following a final hearing on the Motion, on a permanent basis, in accordance with its operating needs.

42.     The Debtors' assets consist primarily of: (i) cash; (ii) inventory; (iii) fixed assets; and (iv) accounts receivable. As of the Petition Date, the Debtors, on a consolidated basis, had approximately $365,000.00 of cash on hand, inventory with a book value of approximately $501,000.00,[5] fixed assets with a book value of approximately $12,758,000.00, and accounts receivable (i.e. short term credit card receivables) of approximately $300,000.00.[6]

43.     As of the Petition Date, the Debtor, E&C, owed GE CEF approximately $18,800,000.00 pursuant to the Loan Agreement (the GE CEF Prepetition Obligation). GE CEF asserts, that the GE CEF Obligation is secured by a lien against substantially all of the Debtors' assets. Also, as of the Petition Date, the Debtor RIL owed Fifth Street approximately

---

[5] The consolidated retail value of the Debtors' Petition Date inventory was approximately the same as book value.
[6] These figures are given on a consolidated basis. The Debtors are investigating the extent to which the Lenders have an interest in Cash Collateral, if any, as to each specific debtor.

$3,500,000.00 (the "Fifth Street Prepetition Obligation"). Fifth Street asserts that the Fifth Street

Prepetition Obligation is secured by a lien on substantially all of RIL's assets. As of the Petition

Date, RIL does not believe it owes any money to Royal Bank, although a lien search appears to

indicate that Royal Bank has a filed lien on substantially all of RIL's assets. Also, as of the

Petition Date, the Debtor Elephant & Castle Group Inc. does not believe it owes any money,

although a lien search appears to indicated that TD Bank has a filed UCC1 on substantially all of

Elephant & Castle Group Inc. assets. Finally, as of the Petition Date, E&C Pub Inc. is not aware

of any money (other than ordinary course of business), although a lien search appears to indicate

that Sysco has a filed UCC1 on substantially all of E&C Pub Inc.'s assets. The GE CEF

Prepetition Obligation, the Fifth Street Prepetition Obligation, and the Royal Bank Prepetition

Obligation, collectively should be referred to as the "Prepetition Obligations".

     44.    The Debtors need immediate authority to use Cash Collateral to fund its day-to-

day operations so as to preserve the going concern value of the Debtors. I believe that the

Debtors' use of Cash Collateral is absolutely essential for the Debtors' continued operations and

is therefore in the best interest of creditors and this bankruptcy estate.

**E.**    <u>**Honor Existing Obligations**</u>

    **Debtors' Motion for Order (i) Authorizing (a) Payment of Pre-Petition
Wages, Salaries and Employee Benefits, (b) Reimbursement of Employee
Business Expenses, and (c) Payment of Other Employee Related Amounts;
and (ii) Authorizing Applicable Banks and Other financial Institutions to
Receive, Process, Honor and Pay All Checks and Drafts Drawn on Debtors'
<u>Bank Accounts Relating to the Foregoing.</u>**

     45.    The Debtors have requested that this Court enter an Order (i) authorizing (a)

payment of pre-petition wages, salaries and employee benefits, (b) reimbursement of employee

business expenses, and (c) payment of other employee-related amounts; and (ii) authorizing

applicable banks and other financial institutions to receive, process, honor and pay all checks and

drafts drawn on debtors' bank accounts relating to the foregoing.

46.     The continued maintenance of employee pay and benefits is essential to the

ongoing and valued services of the Debtors' employees.  Accordingly, the Debtors have sought

authority to pay certain pre-petition obligations to its employees.  These pre-petition obligations

include various sums for:  wages and salaries, federal and state withholding taxes, contributions

to employee benefit plans and all other employee benefits that the Debtors pay in the ordinary

course of business, as well as reimbursable expenses as defined in the above-referenced Motion

(collectively, the "Employer Obligations").  Furthermore, as a service to its employees, the

Debtors withhold certain amounts from its employees' paychecks for the benefit of designated

recipients for various purposes, including, without limitation, the payment of wage garnishments.

The Debtors withhold such amounts and pays them directly to the appropriate entity.

47.     The Debtor has approximately 866 employees.  In order to ensure that their

employees are paid in the ordinary course as and when compensation payments become due, the

Debtors specifically request that the order approving this Motion also provide that the banks

providing the accounts from which disbursements are made be authorized to service and

administer the accounts as described above without interruption, and, in the usual and ordinary

course of business, to receive, process, honor and pay any and all electronic or wire transfers,

checks and drafts drawn on the Debtors' accounts, whether presented for payment before or after

commencement of these chapter 11 cases by the holder thereof, provided that sufficient funds are

in the Debtors' accounts to cover them.

48.     Although the Debtors seek authority to make the requested payments, they do not

believe that the Court should direct them to pay any specific claim.  Additionally,

notwithstanding anything to the contrary, the payment of any claims pursuant to the Order, if

entered, shall neither (i) make such obligation an administrative expense of the Debtors' estates

nor (ii) constitute approval by the Court of any employee plan or program including any bonus

plans.

49. <u>Wages, Salaries and Compensation</u>. In the ordinary course of their business, the

Debtors issue payroll checks on a bi-weekly basis. However, the payroll for the restaurants in

the United States and the restaurants in Canada are on alternating bi-weekly schedules.

50. Employees in the United States are paid bi-weekly on Fridays for the two

preceding weeks. The employees have been paid for the payroll period ending June 19, 2011.

As of the Petition Date, the employees will not have been paid for the partial payroll period

through June 20 - 28, 2011. Employees would normally be paid for this pay period on July 8,

2011.

51. Pre-petition, the average aggregate gross bi-weekly payroll to all employees in the

United States was approximately $295,000.

52. Employees in Canada are also paid bi-weekly on Thursdays for the two preceding

weeks. The employees have been paid for the payroll period ending June 12, 2011. As of the

Petition Date, the employees will not have been paid for the payroll period through June 26,

2011 and the partial payroll period through June 28, 2011. Employees would normally be paid

for these payroll periods on June 30, 2011 and July 14, 2011.

53. The average, pre-petition aggregate gross bi-weekly payroll to all employees in

Canada was approximately $285,000.

54. The Debtors believe that as of the Petition Date, approximately $500,000.00 in

accrued pre-petition wages and salaries ("Wages and Salaries") is due and owing to Debtors'

employees for services rendered within the 180-day period immediately preceding the Petition

Date. To the Debtors' knowledge, none of their employees are individually owed more than

$11,725 on account of wages earned prior to the Petition Date.

55.    In addition to pre-petition wages and salaries, the Debtors have incurred pre-

petition obligations to former employees for accrued vacation and personal time off and have

incurred pre-petition obligations to employees for vacation, holiday, sick leave, and severance

pay. This Motion requests that the Debtors be granted the authority, but not the obligation, to

pay former employees and employees to the extent that any amounts may be owed to them. As

of the Petition Date, the Debtors estimate that they owe approximately $150,000.00 of accrued

but not paid time-off benefits.

56.    Employee Insurance Benefits. The Debtors maintain various plans and policies to

provide employees with certain insurance and other similar benefits such as health, dental,

accidental death and dismemberment, short term disability and long term disability benefits (the

"Employee Insurance Benefits"). The Debtors believe that such pre-petition premiums for

Employee Insurance Benefits have been paid. Thus, relief is sought simply to provide the

Debtor authority to pay any such amounts which may arise (although the Debtor will not be

required to do so).

57.    Various insurance coverage is an important element of the Employee Insurance

Benefits program, which Debtor provides through a premium-based insurance plan. Employees

and their families rely on the Debtor to provide continuing health care. Any failure to pay these

amounts would be injurious to employee welfare, morale and expectations. To the extent that

any claims or premiums for Employee Insurance Benefits remain unpaid on the Petition Date,

the Debtor seeks authorization to pay those amounts.

58.    <u>Pre-Petition Employee Benefits Withheld from Paychecks and Related</u>
<u>Deductions</u>.  The Debtors deduct from their employees' paychecks payroll taxes and the
employees' portion of FICA and unemployment taxes, employee contributions for health benefits
and legally ordered deductions such as wage garnishments, child support and tax levies, if any
(the "Employee Deductions").  The Debtors forward amounts equal to any Employee Deductions
from their main bank accounts to appropriate third-party recipients.  Due to the commencement
of these chapter 11 cases, funds were deducted from employee salaries but may not have been
forwarded to appropriate third-party recipients.  The Debtors withhold approximately
$226,000.00 per month in Employee Deductions.  By this Motion, the Debtors seek authority to
forward the Employee Deductions, if any, to the appropriate parties.

Pre-Petition Reimbursable Expenses

59.    Prior to the Petition Date and in the ordinary course of their business, the Debtors
reimbursed employees and officers for certain business-related expenses incurred in the scope of
their employment, including, without limitation, business meals, phone costs and other
miscellaneous business expenses incurred on behalf of the Debtors with the understanding that
the employee would be reimbursed (the "Employee Expenses").  The Debtors believe that there
are no outstanding Employee Expenses due, but seeks authority to pay any claims for same that
may arise.

60.    <u>Employee Bonuses</u>.  The Debtors maintain a bonus program based upon a
percentage of cash operating profit at each restaurant.  The bonuses are usually paid on a
quarterly basis; however, the payment of bonuses for the first quarter 2011 was delayed.  The
first quarter bonuses to employees at restaurants in the United States were paid on June 21, 2011.
The Debtors expected to pay Canadian employees their first quarter bonuses on June 30, 2011.

{M0942774.1}

61.    Employees in the U.S. and Canada may also earn bonuses for the second quarter ending on June 12, 2011.

62.    The Debtors seek permission to pay an aggregate approximate amount of $1,241.00 for first quarter bonuses to Canadian employees and to pay second quarter bonuses in the ordinary course of business.

**Debtors' Motion for Entry of Order Granting (i) Authority to Continue to Use Certain of Their Pre-Petition Bank Accounts, Check Stock and Existing Business Forms, and (ii) Waiver of Compliance with the Bankruptcy Code Section 345(b) Investment Guidelines**

63.    The Debtors also have requested authority to continue to use certain of its pre-petition bank accounts, check stock and existing business forms as I have described below. To service its operations, the Debtors have a comprehensive cash management system in place, which is reviewed and monitored by the Debtors' internal accounting staff. If the Debtors were required to close existing bank accounts and open new accounts, there would likely be a meaningful disruption in the Debtors' ability to collect and disburse funds in the ordinary course of their operations. The Debtors' bank accounts operate as follows:

64.    The Debtors use a centralized Cash Management System (the "Cash Management System") to collect and transfer funds from and for, and to pay expenses incurred by the Debtors.

65.    <u>United States Cash Management System</u>. Wells Fargo operates as the Debtors' central bank. All accounts payable, rent and other checks are drawn upon the Wells Fargo account (the "Wells Fargo Account"). The checks are identified by different sequential numbers that will prompt whether the check corresponds to a particular restaurant and type of payment. Visa, MasterCard, American Express and Discover settlements and adjustments are deposited and debited from the Wells Fargo Account. These deposits and debits identified by the different merchant numbers that correspond to a specific restaurant.

66.    Payroll is paid through E&C International, Inc., one of the Debtors. However, funds from the Wells Fargo Account are transferred to E&C International, Inc.'s account in order to fund payroll. The E&C International, Inc. account is also at Wells Fargo.

67.    Every Debtor-owned restaurant in the United States maintains two separate, local bank accounts, one is called a "Manager's Account" from which cash-on-delivery invoices are paid and petty cash funds are replenished (depending on historical need) and the second is called an "Operating Account" where cash collected from sales is deposited. Twice a week and depending upon the balances, funds are transferred or swept from these accounts into the Wells Fargo Account

68.    Transfers to the Canadian bank accounts, if funds are needed, are initiated from the Wells Fargo Account.

69.    <u>Canadian Cash Management System</u>. The main bank in Canada is RBC Royal Bank. There are three accounts for Elephant & Castle Canada, Inc. and two accounts for Elephant & Castle Group, Inc.

70.    <u>Elephant & Castle Canada, Inc</u>. Similar to the restaurants in the United States there is one main sweep account at RBC Royal Bank where all credit card and debit card receipts are deposited. In addition, all accounts payable checks are presented on this account and as well as bi-weekly payroll. Payments on the American Express corporate credit card and certain vendor direct debit payments are made from this account.

71.    In Canada there is one Manager's Account at RBC Royal Bank for all locations unlike the United States where there are individual accounts for each location. The restaurant managers deposit their cash receipts into this account and write store level manager checks for

various cash-on-delivery expenses.  Excess funds in this account are swept on a periodic basis into the RBC Royal Bank main account.

72.    The third account is referred to as the Winnipeg VLT account.  The Winnipeg restaurant has video lottery terminals that are regulated by the province of Manitoba.  The proceeds from lottery sales are deposited into this account.  The province debits it share of receipts on a weekly basis from this account. Elephant & Castle Canada, Inc. transfers its share of the proceeds to the RBC Royal Bank main account on a monthly basis.

73.    Elephant & Castle Group Inc.. There is one U.S. dollar account and one Canadian dollar account for this entity both at RBC Royal Bank.  These accounts are used to pay overhead expenses and expenses that must be allocated across a number of locations.  In addition, funds transferred from the United States flow through the U.S. dollar account.

74.    Intercompany Transfers.  The Debtors routinely transfer funds between various Debtors. The Debtors account for each such transfer with intercompany debts that are recorded as bookkeeping entries.

75.    The Debtors are seeking authority to use the above described "cash management system" in the same manner as such accounts were used prior to the commencement of the Debtors' bankruptcy cases.

**Debtors' Motion for an Order Authorizing (i) the Debtors to Remit and Pay Certain Taxes and Fees and (ii) Financial Institutions to Process and Cash Related Checks and Transfers**

76.    The Debtors: (a) collect sales and use taxes from their customers for ultimate remittance to taxing authorities; (b) incur taxes, including gross receipt, franchise, real and personal property, income, entertainment, and other taxes in operating their business (items (a) and  (b) together, collectively, the "Taxes"); (c) charge fees and other similar charges and

assessments on behalf of various taxing, licensing, and other governmental authorities; and (d)

pay fees to such authorities for licenses and permits required to conduct the Debtors' business in

the ordinary course (items (c) and (d) together, collectively, the "Fees"). The Debtors pay the

Taxes and Fees bi-weekly, monthly, quarterly, semi-annually, or annually to the respective

Authorities, in each case as required by applicable laws and regulations.

77.     The Debtors seeks authority to pay any Taxes and Fees that were accrued pre-

petition and in the ordinary course of business, but were not in fact paid or processed pre-

petition, or were paid in an amount less than is actually owed, or to the extent any such payments

made pre-petition were rejected, lost or otherwise not received in full by any Authority.

78.     Although the Debtors seek authority to make the requested payments, they do not

believe that the Court should direct them to pay any specific Taxes or Fees. Additionally, the

relief sought in this Motion is with respect to any Taxes and Fees that were currently owed as of

the Petition Date or that were timely paid prior to the Petition Date, but such payment had not

been processed as of the Petition Date. This Motion does not seek relief to pay past due Taxes or

Fees.

79.     The Debtor's failure to pay the Taxes and Fees could have a material and adverse

impact on its ability to operate in the ordinary course of business and thus impair this proceeding

to the detriment of all constituents.

80.     Furthermore, many of the tax liabilities may constitute trust fund taxes that the

Debtor has collected and holds in trust for the benefit of the Authorities. Therefore, such funds

are not property of the estate. Moreover, to the extent that the Authorities would hold a secured

or priority claim for the Taxes and Fees, payment of these amounts at this time will not give the

Authorities any more recovery than they would otherwise be entitled to under the Bankruptcy Code.

81.     Accordingly, the Debtor seeks entry of an order authorizing, but not directing, the Debtor to pay any Taxes and Fees that are determined to be owed without regard to whether such obligations accrued or arose before or after the Petition Date.

**Debtors' Motion Pursuant to Section 366 of the Bankruptcy Code for Entry of an Order: (i) Prohibiting Utilities From Altering, Refusing or Discontinuing Services for Pre-Petition Invoices; (ii) Determining that the Utilities Are Adequately Assured of Post-Petition Payment; and (iii) Establishing Procedures for Determining Requests for Additional Adequate Assurance**

82.     By this Motion, the Debtors seek an order (i) prohibiting the Utility Companies from altering, refusing or discontinuing services, (ii) deeming that the Utility Companies are adequately assured of post-petition payment, and (iii) establishing procedures for determining requests for additional adequate assurance of payment.

83.     Specifically, the Debtors seek to provide assurance of payment through the following procedures (the "Determination Procedures"):

(a)     The Debtors shall provide each such Utility Company which is not currently holding a security deposit with a security deposit (the "Security Deposit") in an amount equal to the average one month obligation for utility service over the past twelve months prior to the Petition Date for such Utility Company. If the Utility Company currently holds a Security Deposit, the Debtors shall not be required to post an additional deposit.

(b)     If a Utility Company asserts that the treatment provided pursuant to paragraph (a) above does not constitute satisfactory assurance of payment, then such Utility Company may request additional adequate assurance (an "Additional Assurance Request") pursuant to section 366(c)(3) of the Bankruptcy Code. Any such Additional Assurance Request must be sent so as to be received within 30 days after the entry of the interim order on this Motion (the "Utility Order"), attached hereto as Exhibit "B", to Massachusetts Elephant & Castle Group, Inc., 02109 (Attn: Keith A. Radford, with a copy to Eckert Seamans Cherin & Mellott, LLC, Two International Place, 16th Floor, Boston, MA 02110-2602 (Attn: John G. Loughnane, Esquire) and shall specify (i) the amount and nature of assurance of payment that would be satisfactory to the Utility

Company, (ii) the type of utility services that are provided, (iii) a list of any deposits or other security currently held by such Utility Company and held by such Utility Company immediately prior to the Petition Date on account of the Debtors, (iv) a description of any payment delinquency or irregularity by the Debtors for the post-petition period, and (v) detailed reason(s) why the Security Deposit does not constitute satisfactory assurance of payment.

(c)     Without further order of the Court, the Debtors may enter into agreements granting to the Utility Companies any assurance of payment that the Debtors, in their sole discretion, determine is reasonable.

(d)     If a Utility Company timely makes an Additional Assurance Request that the Debtors believe is unreasonable, then, upon the written request of the Utility Company and after good faith negotiations by the parties, the Debtors will (i) file a motion seeking to modify the Additional Assurance Request to an amount that the Debtors believe is adequate (a "Determination Motion"), and (ii) schedule the Determination Motion to be heard by the Court at the next regularly-scheduled omnibus hearing in this case that is at least 20 days after the filing of the Determination Motion (a "Determination Hearing"). The Debtors will not be required to file a Determination Motion with respect to any such Utility Company earlier than 40 days after the Petition Date.

(e)     The Utility Companies shall be prohibited from altering, refusing, or discontinuing services, and shall be deemed to have adequate assurance of payment, pending negotiation and receipt of assurance of payment pursuant to the Determination Procedures or an order determining adequate assurance following a Determination Hearing.

(f)     Any assurance of payment provided by the Debtors to a Utility Company in accordance with the Determination Procedures shall, to the extent not used by the Utility Company to satisfy a post-petition default, be returned to the Debtors within 30 days after the effective date of a chapter 11 plan in this case without further order of the Court.

(g)     Any Utility Company that does not timely make a written Additional Assurance Request in accordance with the Determination Procedures shall be deemed to have adequate assurance of payment under section 366(b) of the Bankruptcy Code, without prejudice to such Utility Company's right to seek relief under section 366(c)(3)(A).

84.     In the normal course of its business, the Debtor uses electricity, water, telephone and other utility services provided by the Utility Companies. All of these utility services are essential to the safe and efficient operation of the Debtor's business. Continuing utility services

to the Debtor is essential to its ability to sustain operations while its chapter 11 case is pending. An interruption of utility services, no matter how brief, would severely disrupt the Debtor's business operations.

**Debtors' Motion for Entry of an Order Authorizing the Debtors to Honor Certain Pre-Petition Obligations to Customers and to Otherwise Continue Customer Practices and Programs in the Ordinary Course of Business**

85.    The Debtor seeks an Order authorizing the Debtors to honor or pay certain pre-petition obligations to its customers in the ordinary course of business.

86.    Prior to the Petition Date and in the ordinary course of its business, the Debtors engaged in certain practices to maximize sales, engender customer loyalty, and develop and sustain brand loyalty and a positive reputation in the marketplace. These practices include, but are not limited to, the following: (i) a gift card program (the "Gift Card Program"); and (ii) coupons/discounts (together with the Gift Card Program, the "Customer Programs").

87.    The Customer Programs, which are common place among establishments similar to those operated by the Debtors, are described in detail below. The common goals of Customer Programs are to meet competitive pressures, ensure customer satisfaction, and generate brand loyalty and goodwill for the Debtors, thereby retaining current customers, attracting new ones, and ultimately improving the going concern value of the business..

88.    The Debtors need to continue the Customer Programs post-petition, which have been beneficial to their businesses and, in connection therewith, the Debtors seek authority to honor its pre-petition obligations with respect to such Customer Programs in the ordinary course of business. Such relief is necessary to preserve the Debtors' critical customer relationships and goodwill for the benefit of the estates.

## CONCLUSION

89.    Accordingly, for the reasons stated herein and in each of the first day applications and motions, the Debtors respectfully request that the First Day Orders be approved.


_____
KEITH RADFORD,
Chief Financial Officer of the Debtors and
Debtors-in-Possession


Dated:  June 28, 2011



Exhibit "A"