# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MASSACHUSETTS
## (EASTERN DIVISION)

|  |  |
|---|---|
| In re:<br><br>Massachusetts Elephant & Castle Group, Inc., et al.[1]<br><br>Debtors | Chapter 11<br><br>Case No. 11-16155<br><br>Jointly Administered<br><br>Rel. Docket Nos. 4, 20, 109 |

## OBJECTION OF GE CANADA EQUIPMENT FINANCING, G.P. TO DEBTORS' CASH COLLATERAL MOTION

GE Canada Equipment Financing, G.P. ("GE CEF"), in its capacity as senior secured lender under that certain Fourth Amended and Restated Loan Agreement, dated as of December 18, 2009 (as amended, restated, or otherwise modified, the "Loan Agreement"), files this objection (the "Objection") to the Motion of the Debtors for an Order Pursuant to Sections 105, 361, 362, and 363 of the Bankruptcy Code (A) Authorizing Use of Cash Collateral; (B) Granting Adequate Protection; (C) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001; and (D) Granting Related Relief [Docket No. 4] (the "Cash Collateral Motion").[2]  In support of this Objection, GE CEF states as follows:

---

[1]  The Debtors in these cases, along with the last four digits of the federal tax identification number for each of the debtors, are Massachusetts Elephant & Castle Group, Inc. (5090), Elephant and Castle of Pennsylvania, Inc. (9152), E&C Pub, Inc. (4001), Elephant & Castle Inc. (Washington) (3988), Elephant & Castle (Chicago) Corporation (5254), Elephant & Castle East Huron, LLC (8642), E&C Capital, LLC (4895), Elephant & Castle Illinois Corporation (2811), E&C Eye Street, LLC (1803), Elephant & Castle International, Inc. (5294), Elephant & Castle Pratt Street, LLC (7898), Elephant & Castle Group Inc. (no U.S. EIN), Elephant & Castle Canada Inc. (no U.S. EIN), Repechage Investments Limited (no U.S. EIN), and Elephant & Castle, Inc. (Texas) (no U.S. EIN).

[2]  Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Cash Collateral Motion.

## PRELIMINARY STATEMENT

1.     For the last few years, the Debtors' operating and financial performance has deteriorated at an alarming rate, despite various restructuring initiatives undertaken by the Debtors.  Recognizing their inability to effect a successful operational turnaround, the Debtors, with the assistance of BellMark Partners, LLC ("BellMark"), their investment banker, commenced a process for the sale of their businesses several months prior to the commencement of these chapter 11 cases.  By the time of the filing, the Debtors had received several non-binding expressions of interest, all subject to numerous contingencies, including a due diligence out.  Those expressions of interest proposed purchase prices confirming what GE CEF had feared – that even on a going concern basis, it is at best marginally oversecured and in danger of becoming undersecured.[3]

2.     The Debtors filed their chapter 11 cases for the express purpose of conducting and consummating a sale of their businesses pursuant to § 363 of the Bankruptcy Code.  Indeed, in his "first day" Declaration, David Dobbin, who owns all of the equity of the Debtors and also serves as the Debtors' President and Chairman of the Board of Directors, testified that:

> Since April 2011, with the assistance of an investment banking firm with significant experience in the restaurant sector, E&C has engaged in a process for the sale and/or recapitalization of E&C.  Those efforts resulted in the identification of a number of interested parties.  Due diligence is ongoing with several potential purchasers and expressions of interest have been received.  It is the Debtor's intention to sell their businesses through a Section 363 sale under the United States Bankruptcy Code.  The Debtors believe that a Section 363 sale as a going concern is in the best interest of the Debtors, its employees, its creditors and other interested parties.

See Declaration of David Dobbin in Support of First Day Motions [Docket No. 2] (the "Dobbin Declaration"), ¶ 19 (emphasis added).

---

[3]     Upon request of the Court, GE CEF will provide the Court copies of these letters of interest.

3.     Nevertheless, in the nearly two months since the Petition Date (as defined below), the Debtors have made virtually no progress towards the contemplated § 363 sale, and in fact appear to have put the entire § 363 process on hold.  We now know the reason.  Mr. Dobbin and/or other representatives of the Debtors apparently are advising the various § 363 bidders that the Debtors are now focused on developing a plan of reorganization in which Mr. Dobbin would partner with one of the § 363 bidders and thereby retain a substantial portion of the equity of the reorganized company.  Further, the Debtors are apparently "inviting" those bidders to negotiate directly with Mr. Dobbin concerning the terms of such a plan rather than submit their own § 363 bid.  In short, despite being way out of the money, Mr. Dobbin appears to be causing the Debtors to abandon a competitive § 363 sale process in favor of pursuing some sort of "new value" plan of reorganization based on the bid of whichever third-party purchaser is willing to divert the most value to Mr. Dobbin.  Whether or not Mr. Dobbin's  insinuations have been explicit or implied, the third-party prospective bidders now believe that if they want to be the successful bidder, they must give a piece of the action to Mr. Dobbin through a plan rather than submit the highest and best § 363 offer.   In effect, Mr. Dobbin, through his control of the Debtors, is seeking to use the Debtors' exclusivity rights to extract value for himself to the detriment of other creditors, including GE CEF.

4.     Mr. Dobbin's latest machinations have completely undermined the integrity of the sale process, and even if those efforts fail, they will unduly prolong these cases, perhaps to the point where the Debtors run out of cash before they can consummate a going concern sale.  The Debtors entered into bankruptcy with precious little cash collateral, and given the escalating professional fees and other bankruptcy-related expenses in these cross-border cases and the Debtors' undeniably precarious condition, it is far from clear that the Debtors can survive for much longer, much less realize going concern value through a sale process.

5.      The Debtors, which are controlled by Mr. Dobbin, have a duty to creditors to maximize the value of their estates and must adequately protect GE CEF's interest in its collateral.  To fulfill these obligations, at a minimum the Debtors must (a) completely divorce Mr. Dobbin from the § 363 sale/plan process by, among other things, vesting exclusive authority over such process to an independent Chief Restructuring Officer reasonably acceptable to the Committee and GE CEF ("CRO") or alternatively to a newly appointed independent director acceptable to the Committee and GE CEF ("Independent Director"), and (b) be obligated to comply with a specified timeline for expeditiously completing the § 363 sale process and thereby honor the promise they made at the outset of the cases – "to sell their businesses through a Section 363 sale."  GE CEF should be permitted to submit a credit bid as part of this § 363 process, and to the extent Mr. Dobbin wants to submit a bid, he should participate in the § 363 sale process on the same basis as any third-party bidder without any special treatment.

6.      Importantly, Mr. Dobbin should not be allowed to hijack the competitive sale process by causing the Debtors to file a "new value" plan of reorganization, as he could easily reconfigure any such proposal as a § 363 bid and participate in an auction process on an equal footing with all other bidders.  Alternatively, if the Debtors want to preserve the possibility of filing a "new value" plan, (a) the prior approval of the CRO or Independent Director should be required, (b) the Debtors should still be obligated to pursue a § 363 process on a parallel track, and (c) as required by United States Supreme Court precedent, any "new value" plan must be market tested by terminating exclusivity and permitting any party-in-interest, including GE CEF, to file a competing plan pursuant to a synchronized confirmation timeline.

7.      Since the commencement of these cases, GE CEF has been exceedingly patient with the Debtors, and on the assumption that the Debtors would keep their word by expeditiously proceeding with a § 363 process and quickly reaching agreement with GE CEF on the final cash

collateral order, GE CEF consented to the interim use of cash collateral based on a very barebones interim order that lacks many of the protections customarily found in cash collateral orders (including a provision for payment of postpetition interest and expenses).  And despite having sent Debtors' counsel a draft of the final cash collateral order on July 26, 2011, GE CEF has yet to receive any mark-up or other response.[4]  Time is running out, and GE CEF is no longer willing to consent to the use of cash collateral without the entry of an acceptable final cash collateral order that includes not only the customary protections but also the provisions described above and in greater detail below – provisions that will ensure that the Debtors' businesses are sold pursuant to a transparent, robust auction process untainted by any interference from Mr. Dobbin.

## BACKGROUND

8.    On June 28, 2011 (the "Petition Date"), the Debtors filed with this Court voluntary petitions for relief under chapter 11 of title 11 of the United States Code.  On July 12, 2011, the Office of the United States Trustee appointed an Official Committee of Unsecured Creditors (the "Committee") in these cases.

**A.    GE CEF's Claims**

9.    Prior to the Petition Date, GE CEF extended loans and other financial accommodations to the Debtors pursuant to the Loan Agreement and other agreements.  The outstanding principal amount of the obligations (the "Obligations") of the Debtors to GE CEF under the Loan Agreement and other agreements is approximately $21,345,000, and with the postpetition accrual of interest and expenses, GE CEF's claim will soon exceed $22 million. The Obligations are secured by first-priority liens and security interests on all or substantially all

---

[4]    Debtors' counsel has indicated that they will provide a revised draft of the final cash collateral order by August 19, 2011.

of the Debtors' property.  GE CEF's claims are described in further detail in the Proof of Claim GE CEF has filed with the Debtors' claims agent.

**B.      Other Liabilities of the Debtors**

10.      The parent Debtor, Repechage Investments Limited, is indebted to Fifth Street Finance Corp. ("Fifth Street") in the approximate prepetition principal amount of $3.5 million. On information and belief, the Debtors are also liable for the following claims that either have prepetition priority or would be required to be paid as a cure cost in connection with any § 363 sale: (a) approximately $1.35 million in prepetition sales taxes, (b) approximately $300,000 in prepetition rent arrearages, (c) approximately $300,000 in asserted § 503(b)(9) claims, and (d) an indeterminate amount of fees and expenses of the professionals retained by the Debtors and the Committee.  Finally, on information and belief, the aggregate amount of general unsecured claims against the Debtors likely exceeds $3 to $4 million.

**C.      Current Use of Cash Collateral**

11.      On June 29, 2011, the Debtors filed the Cash Collateral Motion seeking authority to use cash collateral and grant adequate protection to the Lenders in the form of replacement liens and other protection described in the Cash Collateral Motion.  At this time, cash collateral use has been approved on only an interim basis.  See Second Interim Cash Collateral Order [Docket No. 109].  A continued hearing on the Cash Collateral Motion is scheduled for August 23, 2011.

**D.      The Debtors' Sale Efforts**

12.      Before the Petition Date, the Debtors failed to make their debt service payments to GE CEF and committed other defaults under the Loan Agreement and other related agreements.  Additionally, the Debtors were experiencing cash constraints and having difficulties

making payments to critical suppliers, landlords, and tax authorities.  See Dobbin Declaration, ¶ 16.

13.     In response to these severe financial and operating challenges, from April of 2011 to the Petition Date, the Debtors actively sought to sell their businesses as a going concern.  In connection with a possible sale, the Debtors hired BellMark as its investment banker to market the company, identify potential buyers, and manage the sale process.  In June of 2011, the Debtors received several prepetition expressions of interest from bidders who had not yet conducted any meaningful due diligence, which bids ranged from leaving GE CEF undersecured to barely oversecured.  These expressions of interest, of course, were subject to numerous contingencies, including satisfactory completion of due diligence, and potential purchase price adjustments, and hence there is a substantial likelihood that were these bidders to conduct due diligence and factor in the adverse consequences of the bankruptcy filing and the possible deterioration in the Debtors' businesses, they would substantially reduce their bids.

14.     Based on the perhaps overly optimistic assumption that the non-binding expressions of interest received months ago are still reflective of the Debtors' going concern value, GE CEF at best is marginally oversecured, and may well become undersecured if these cases continue to drag on without resolution.  And even if the Debtors could somehow convert the highest non-binding expression of interest into a consummated sale transaction, the net proceeds from such transaction would still be insufficient to cover GE CEF's secured claim, cure costs and administrative priority and prepetition priority claims.  At the very least, the Debtors' prepetition sale efforts leave no doubt that Mr. Dobbin, as the sole equityholder, is hopelessly out of the money.

15.     As Mr. Dobbin testified in his first day Declaration, the Debtors "believe that a Section 363 sale as a going concern is in the best interest of the Debtors, its employees, its

creditors and other interested parties," and for that reason they filed these cases. Unfortunately, despite the passage of nearly two months since their bankruptcy filing, the Debtors have made no progress towards effectuating a § 363 sale. No bidding procedures motion or sale motion has been filed, nor have any bids been solicited. Moreover, to the knowledge of GE CEF, the Debtors have not been negotiating definitive documentation, selecting a stalking horse, or drafting bidding procedures. Simply put, the § 363 sale process has completely stalled.

16.     Indeed, at the direction of Mr. Dobbin, the Debtors appear to have put the § 363 sale process on the back burner, at least temporarily, in order to allow Mr. Dobbin to conjure up a "new value" plan of reorganization designed to salvage his worthless equity stake in the company. To minimize his own monetary contribution under this new value plan, the Debtors are "inviting" bidders to team up with Mr. Dobbin and essentially reformulate what would have been their § 363 bid into a plan of reorganization that would carve-out a substantial slice of the equity for Mr. Dobbin. As a result, many of the bidders believe that the § 363 process has been abandoned and that in order to best position themselves to purchase the company, they must team up with Mr. Dobbin and give him a sizeable stake in the purchased business. Thus, what was supposed to have been a robust auction process to elicit the highest and best bid that maximizes creditor recoveries appears to be on the verge of degenerating into an unseemly contest among bidders to offer the highest consideration for Mr. Dobbin. At the very least, the third-party bidders are utterly confused about the status of the § 363 process, and those bidders who have no desire to "to pay to play" with Mr. Dobbin or who otherwise perceive the process as being protracted or rigged in Mr. Dobbin's favor may well drop out altogether.

17.     Unquestionably, Mr. Dobbin has a glaring conflict of interest in these cases as he not only controls the Debtors but is also a potential plan sponsor/bidder for the acquisition of the Debtors' businesses. GE CEF and the Committee have strongly voiced their concerns regarding

Mr. Dobbin's conflict of interest to the Debtors.  In particular, GE CEF has asked the Debtors to take immediate steps to ensure Mr. Dobbin has no decision-making authority with respect to the sale process or any role in making management presentations to, or engaging in any other communications with, prospective purchasers, as he may seek to manipulate those bidders' perception of the Debtors' businesses in ways that suit his own interest as a competing bidder. GE CEF understands that the Debtors are now considering seeking court approval to retain a CRO, though it is unclear whether the proposed CRO will have adequate authority to run a robust auction process that is not directly or indirectly influenced by Mr. Dobbin.  GE CEF will reserve judgment on the particular CRO selected by the Debtors until it better understands the contemplated role of that CRO and the proposed terms of engagement.

**E.**     **The Debtors' Postpetition Performance**

18.     The Debtors' businesses have also been struggling.  When they filed for chapter 11 protection, they had only approximately $358,000 of cash collateral on hand, leaving little cushion for funding their cross-border bankruptcy and addressing any adverse developments in their businesses.  GE CEF has been advised that the Debtors are projected to have $648,000 of cash collateral as of August 21.  That modest increase is completely illusory, as the Debtors have not been paying GE CEF any postpetition interest or expenses; nor have they paid any of the mounting professional fees that have accrued to date.[5]  Those accruals undoubtedly exceed $300,000 a month – more than double the artificial $300,000 increase in cash collateral achieved during the first two months of the cases.  In short, the Debtors' already skimpy liquidity is steadily eroding, not increasing.  Given the Debtors' precarious liquidity and the grave operational risks confronting their businesses, the Debtors have very little time to conduct and

---

[5]     In their original cash collateral budget, the Debtors budgeted $225,000 in professional fees for the first month of the bankruptcy, and that amount likely excluded the fees of the Committee's professionals.  Postpetition interest on the Obligations owing to GE CEF is accruing at approximately $133,000 per month.

consummate an auction process, and it is certainly not in the creditors' best interests to suspend

that process even for a limited time to allow Mr. Dobbin the opportunity to parlay the Debtors'

exclusivity rights into a plan of reorganization that is focused solely on maximizing the size of

his equity stake in the businesses.

## OBJECTION

19.    GE CEF is entitled to adequate protection of its interests under § 363(e) of the

Bankruptcy Code.  While the Debtors lack the capability of providing GE CEF the adequate

protection to which it is entitled under the circumstances of this case, GE CEF would be willing

to consent to the Debtors' continued use of cash collateral pursuant to a final cash collateral

order that includes provisions that are described in greater detail in Section B below (at ¶ 27) but

can be summarized as follows: (a) appointment of a CRO or Independent Director (in each case,

who is reasonably acceptable to the Committee and GE CEF) with full authority over the

sale/plan process (after consulting with the Committee and GE CEF), and the complete recusal

of Mr. Dobbin from that process, (b) a commitment by the Debtors to comply with a definitive

and expeditious timetable for effecting a sale under § 363 of the Bankruptcy Code, (c) express

recognition of GE CEF's right to submit a credit bid under § 363 of the Bankruptcy Code,

(d) conditioning the Debtors' right to file a plan of reorganization upon (i) the prior approval of

the CRO or Independent Director, (ii) the Debtors' continued pursuit of the § 363 process on a

parallel track pursuant to the prescribed timetable, and (iii) the immediate termination of

exclusivity to ensure that any such plan is market-tested, and (e) other protections customarily

accorded to secured creditors in cash collateral orders, including monthly payment of GE CEF's

postpetition interest and expenses.

A.    **Applicable Law**

(i)    *Adequate Protection*

20.    Section 363(c)(2) of the Bankruptcy Code permits a debtor to use, sell, or lease

cash collateral only if either of two alternative circumstances exists:

> (A) each entity that has an interest in such cash collateral
> consents; or (B) the court, after notice and a hearing, authorizes
> such use, sale, or lease in accordance with the provisions of this
> section.

11 U.S.C. § 363(c)(2).  Section 363(e) requires that a debtor-in-possession's use of collateral

during the bankruptcy case be conditioned on "adequate protection" of interests in the property.

See 11 U.S.C. § 363(e).  Thus, the Debtors may not use the cash collateral unless they either

(a) obtain GE CEF's consent to the continued use of cash collateral, or (b) provide adequate

protection to GE CEF.  See 11 U.S.C. § 363(e).

21.    The purpose of adequate protection is to shield a secured creditor from diminution

of the value of its security interest during the period of the bankruptcy case.  See In re 495 Cent.

Park Ave. Corp., 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992); In re Beker Indus. Corp., 58 B.R.

725, 736 (Bankr. S.D.N.Y. 1986).  Section 361 describes three ways in which adequate

protection may be provided to a secured creditor:  (1) cash payments; (2) additional or

replacement liens; and (3) such other relief as will result in the realization by the secured creditor

of the "indubitable equivalent" of its interest.  11 U.S.C. § 361.  However, adequate protection

may take many forms not specifically included in § 361.   See, e.g., In re Am. Media, Inc., No.

10-16140 (MG), 2010 Bankr. LEXIS 4626 (Bankr. S.D.N.Y. Dec. 6, 2010) (superpriority

administrative expense claims, replacement liens, interest payments, payment of professional

fees and expenses, and continued maintenance and insurance of the collateral); In re Lane, 108

B.R. 6 (Bankr. D. Mass. 1989) (payment of all real and personal property taxes).  Adequate

protection is a flexible concept and must be determined on a case-by-case basis, with relief

tailored to the facts of the situation.  See Resolution Trust Corp. v. Swedeland Dev. Group, Inc. (In re Swedeland Dev. Group, Inc.), 16 F.3d 552, 564 (3d Cir. 1994); In re O'Connor, 808 F.2d 1393, 1396-97 (10th Cir. 1987); In re Sharon Steel Corp., 159 B.R. 165, 169 (W.D. Penn. 1993); In re Aegean Fare, Inc., 34 B.R. 965, 968 (Bankr. D. Mass. 1983).

22.     GE CEF has no meaningful "equity cushion" and is clearly entitled to further protection of its collateral.  As previously noted, even making the rosy assumption that the non-binding expressions of interest submitted by bidders back in June of 2011, without the benefit of any due diligence, are still indicative of the Debtors' going concern value, GE CEF is at best modestly oversecured, and is at significant risk of becoming undersecured.  And regardless of how "real" those expressions of interest were, realistically, the Debtors' value as a going concern has likely declined significantly since the Petition Date, given the "taint" of bankruptcy and the operational challenges faced by the company.  See In re Exide Techs., 303 B.R. 48 (Bankr. D. Del. 2003) (citing "taint" of bankruptcy as depressing the value of the debtor).

23.     Since GE CEF already has a prepetition lien on all or substantially all of the Debtors' assets, neither granting GE CEF replacement liens on what is already its collateral nor paying GE CEF postpetition interest and expenses from the proceeds of its prepetition collateral satisfies the Debtors' adequate protection obligations to GE CEF.  Accordingly, the Debtors have not provided, and indeed are incapable of providing, the adequate protection to which GE CEF is entitled.  Nevertheless, as will be elaborated below, GE CEF is willing to consent to the Debtors' continued use of cash collateral pursuant to a final order containing the protections outlined below – protections that will ensure fairness and a prompt exit from bankruptcy to the benefit of all stakeholders and that will respect GE CEF's fundamental rights as a secured creditor.

*(ii)*    ***New Value Plans***

24.    The United States Supreme Court in <u>203 N. LaSalle Street Partnership</u> ruled that "when a reorganization plan is proposed by a debtor during the exclusive period and gives old equity holders the opportunity to purchase equity in the reorganized debtor, actual market testing is required of the stock in the reorganized debtor."   <u>H.G. Roebuck & Son, Inc. v. Alter Commc'ns., Inc.</u>, No. RDB-11-0157, 2011 U.S. Dist. LEXIS 59781, at *21 (D. Md. June 3, 2011) (citing <u>Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle Street P'ship</u>, 526 U.S. 434 (1999)).

25.    Courts have found that "<u>LaSalle</u> . . . provides two potential solutions [to a new value plan's violation of the absolute priority rule]:   competitive bidding or termination of exclusivity and the opportunity to file competing bids."   <u>Id.</u> at *25 (reversing plan confirmation and remanding with instructions to terminate exclusivity and allow competing plans to be filed); <u>see also</u> <u>Davis v. Davis (In re Davis)</u>, 262 B.R. 791, 799 (Bankr. D. Ariz. 2001); <u>In re Situation Mgmt. Sys.</u>, 252 B.R. 859, 861 (Bankr. D. Mass. 2000) (same).   Furthermore, termination of exclusivity "ensures compliance with the principles of the <u>LaSalle</u> case."   <u>H.G. Roebuck & Son, Inc.</u>, 2011 U.S. Dist. LEXIS 59781 at *21; <u>In re Situation Mgmt. Sys.</u>, 252 B.R. at 861 (finding that the act of filing a new value plan was sufficient cause to terminate the old equity holders' exclusive right to file a reorganization plan).

26.    Thus, courts have read <u>LaSalle</u> to require termination of the Debtors' exclusive right to file a plan of reorganization in the event that the Debtors file a "new value" plan.  This automatic termination of exclusivity should be included in any final cash collateral order entered in these cases.

B.      **Adequate Protection to Which GE CEF Is Entitled**

27.      While the Debtors are incapable of providing GE CEF with the full measure of adequate protection to which it is entitled, GE CEF is nevertheless willing to consent to the Debtors' continued use of cash collateral if GE CEF, the Debtors and the Committee are able to negotiate the terms of a mutually acceptable final cash collateral order.  From GE CEF's perspective, that final order should include the following terms:

(a)      Sale Process Provisions:

(i)      A CRO or Independent Director, reasonably acceptable to GE CEF and the Committee, shall be appointed by a specified date, and that individual shall be vested with exclusive authority to act on behalf of the Debtors with respect to (x) all aspects of the Debtors' § 363 sale process (including, without limitation, the preparation, negotiation and filing of all sale-related court pleadings and all sale-related transaction documents, terms of the bidding procedures, the selection of the stalking horse bidder and any stalking horse protections, and the selection of the highest and best bid for presentation to the Court for approval), and (y) any plan of reorganization filed by the Debtors (including, without limitation, the decision whether or not to file any such plan).  In exercising such decision-making authority on behalf of the Debtors, the CRO or Independent Director shall consult with GE CEF and the Committee.

(ii)      The Debtors shall be obligated to consummate on or before an outer date to be agreed upon, and to use commercially reasonable efforts at all times to pursue, the sale of all or substantially all of their assets pursuant to § 363 of the Bankruptcy Code.  In addition, the Debtors shall comply with various sale process milestones, including, without limitation, deadlines for the selection of a "stalking horse" asset purchase agreement,  the filing of a bidding procedures and sale motion, the holding of an auction, and the sale hearing.

(iii)      GE CEF shall be entitled, but not obligated, to participate in the § 363 auction process, at its election, either by way of credit bid pursuant to § 363(k) of the Bankruptcy Code or through any other form of bid.  GE CEF's right to credit bid shall apply to any sale of assets included as part of any plan of reorganization (including any plan subject to

confirmation under § 1129(b)(2)(A)(iii)). Any § 363 sale that will not result in payment in full in cash of the Obligations owing to GE CEF at closing shall be subject to the prior written approval of GE CEF.

(iv) Mr. Dobbin shall have no role or input in the § 363 process except solely in his capacity (or any affiliate's capacity) as a bidder (in which case Mr. Dobbin or his affiliate shall be governed by the Court-approved bidding procedures, which procedures shall treat him no more favorably than any third-party bidder). Without limiting the foregoing, Mr. Dobbin shall not participate in any board of director meetings relating to the sale process and shall not participate in any management presentations or other meetings or communications with any third-party bidders.

(v) The Debtors shall not be permitted to file a plan of reorganization without the prior approval of the CRO or Independent Director, and any such plan of reorganization shall be filed no later than the deadline for the filing of the Debtors' bidding procedures and sale motion.  If the Debtors do timely file a plan of reorganization, (x) the Debtors' exclusive rights to file and solicit acceptances for a plan of reorganization shall be immediately terminated without further order of the Court, (y) the Debtors shall continue to comply with the § 363 timetable described above, and (z) the Debtors shall withdraw any filed plan of reorganization to the extent the plan is conditioned on obtaining equity or debt financing, and the Debtors have failed to obtain bona fide commitments to provide such financing by a date to be determined (but in no event after the commencement of the § 363 auction).[6]

(b) Customary Adequate Protection Provisions:

(i) Valid, binding, enforceable, non-avoidable, and automatically perfected postpetition security interests and liens (the "Replacement Liens") in and to all presently owned and hereafter acquired personal property, real property, and all other assets of the applicable Debtors, which Replacement Liens (x) shall be enforceable only to the extent of any postpetition diminution in value of the prepetition collateral of GE CEF, (y) shall be junior only to any non-avoidable, valid, enforceable and perfected liens

---

[6] Since any new value plan can be easily recast as a § 363 bid, it would be far preferable for the Debtors (i.e., Mr. Dobbin) to formulate his proposal as a § 363 bid, and avoid the time, expense and confusion of proceeding down parallel § 363/plan paths.

and security interests in favor of any person or entity on or in the assets of any Debtor, which existed on the Petition Date and are not subject to § 552(a) of the Bankruptcy Code, but only to the extent such liens and security interests are superior in priority to GE CEF's prepetition liens and security interests, and (z) shall not attach to any avoidance claims;

(ii)   As and to the extent provided by §§ 503(b) and 507(b) of the Bankruptcy Code, an allowed superpriority administrative expense claim against the Debtors, which shall have priority over all administrative expense claims and unsecured claims against the Debtors or their estates;

(iii)   Payment of postpetition interest and expenses, including the fees and expenses of GE CEF's professionals, on a monthly basis (which payments will be recharacterized as principal payments should the Court determine that GE CEF is undersecured);

(iv)   Timeline for determining allowability of GE CEF's claims and validity, enforceability and priority of its liens;

(v)   GE CEF and its collateral shall not be subject to surcharge under § 506(c) of the Bankruptcy Code or otherwise;

(vi)   Carve-out for professional fees in amounts and on terms to be agreed upon;

(vii)   The Debtors shall furnish GE CEF and the Committee, or cause to occur, as the case may be:

- A weekly cash report;

- A thirteen (13) week projected cash flow statement;

- Reasonable access to the Debtors' premises, records, personnel and advisors during normal business hours;

- A member of the senior management of the Debtors shall attend a weekly telephone conference with GE CEF's financial advisor;

- Representatives of BellMark to meet with GE CEF to answer questions, provide updates, and deliver written materials;

- Copies of any written expressions of interest, letters of intent, draft purchase agreements or other written proposals from any prospective purchaser; and

- Such other documents, information, and access as may be reasonably required.

(viii)  No Debtor may make any advances or other transfers except in the ordinary course of business, and any claims of any Debtor against any other Debtor arising from any such advances or transfers shall be entitled to administrative priority status under §§ 507(a)(2) and 503(b) of the Bankruptcy Code, and, for avoidance of doubt, no Debtor shall make any advances or transfers to any non-Debtor affiliate except that the Debtors may make transfers to "Terra Nova" entities (collectively, "Terra Nova") to the extent that (x) any payments made by the Debtors to Terra Nova are equal to, and are used to pay, the Debtors' share of the payroll, rent, and other ordinary course operating expenses, and (y) that Terra Nova is "cash neutral" and is not accruing cash or cash equivalents during these cases; and

(ix)  The Debtors' use of cash collateral shall be conditioned upon the Debtors' observance and performance in all material respects of the terms, provisions, covenants, and agreements specified in the Loan Agreement and other agreements directly pertaining to the maintenance and preservation of GE CEF's prepetition collateral.

28.  GE CEF is willing to work collaboratively with the Debtors and other stakeholders to realize the going concern value of the Debtors' businesses through an open, transparent auction process that is conducted on a level playing field and that respects GE CEF's fundamental rights as a secured creditor.  GE CEF believes that inclusion of the foregoing provisions in the final cash collateral order will accomplish that objective.

WHEREFORE, GE CEF respectfully requests that the Court (a) include in any final order approving the use of cash collateral the protections outlined herein, and (b) grant such other and further relief as is just and appropriate under the circumstances.

Dated:  August 19, 2011

Respectfully submitted,

GE CANADA EQUIPMENT FINANCING, G.P.

By its attorneys,

/s/    Charles J. Domestico
DOMESTICO, LANE & McNAMARA, LLP
Charles J. Domestico
BBO No. 128390
Vincent M. Domestico
BBO No. 617117
161 Worcester Road
Framingham, MA 01701
Telephone: (508) 626-9000
Email: cdomestico@dlandm.com
        vdomestico@dlandm.com

-and-

/s/    James Ktsanes
LATHAM & WATKINS LLP
Richard Levy
James Ktsanes
Sears Tower, Suite 5800
233 South Wacker Drive
Chicago, Illinois  60606
Telephone: (312) 876-7700
Email: richard.levy@lw.com
        james.ktsanes@lw.com

## CERTIFICATE OF SERVICE

I, Charles J. Domestico, do hereby certify that on August 19, 2011 electronically filed with the Clerk of the Bankruptcy Court:  Objection of GE Canada Equipment Financing, G.P. To Debtors' Cash Collateral Motion and served same in the following manner upon the interested parties:

E-Mail Service:  via the Court's CM/ECF system which sent notification of such filing to the following:

- Peter J. Antoszyk     pantoszyk@proskauer.com, mwolf@proskauer.com;cslattery@proskauer.com

- Peter D. Bilowz     pbilowz@goulstonstorrs.com

- John Fitzgerald     USTPRegion01.BO.ECF@USDOJ.GOV

- Jennifer L. Hertz     Jennifer.L.Hertz@usdoj.gov

- Joseph G. LaRusso     joseph.larusso@cityofboston.gov

- John G. Loughnane     jloughnane@eckertseamans.com, msally@eckertseamans.com

- Christine D. Lynch     clynch@goulstonstorrs.com

- Alex F. Mattera     amattera@jdemeo.com

- Zachary Mosner     bcumosner@atg.wa.gov

Mail Service: via first-class mail, postage pre-paid, addressed to:

- Dorothy Capers
  U.S. Food Service, Inc.
  9399 W. Higgins Rd.
  Suite 600
  Rosemont, IL 60018

- William W. Huckins
  Allen Matkins Leck Gamble Mallory
  Three Embarcadero Center
  12th Floor
  San Francisco, CA 94111

- Joseph Sgroi
  Honigman Miller Schwartz and Cohn LLP
  660 Woodard Ave
  2290 First National Building
  Detroit, MI

- U.S. Foodservice, Inc.
  c/o Saul Ewing LLP
  Centre Square West
  1500 Market Street, 38th Floor
  Philadelphia, PA 19102

/s/ Charles J. Domestico
Charles J. Domestico